# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| QUADRANT STRUCTURED PRODUCTS COMPANY, LTD., Individually and Derivatively on behalf of Athilon Capital Corp., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 6990-VCL |
| VINCENT VERTIN, MICHAEL SULLIVAN, PATRICK B. GONZALEZ, BRANDON JUNDT, J. ERIC WAGONER, ATHILON CAPITAL CORP., ATHILON STRUCTURED INVESTMENT ADVISORS LLC, MERCED CAPITAL, L.P., MERCED PARTNERS LIMITED PARTNERSHIP, MERCED PARTNERS II, L.P., MERCED PARTNERS III, L.P., and HARRINGTON PARTNERS, L.P., | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: July 28, 2015
Date Decided: October 20, 2015

Catherine G. Dearlove, Russell C. Silberglied, Susan M. Hannigan, Matthew D. Perri, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Sabin Willett, Harold S. Horwich, Samuel R. Rowley, MORGAN, LEWIS & BOCKIUS LLP, Boston, Massachusetts; *Attorneys for Plaintiff Quadrant Structured Products Company, Ltd.*

Philip A. Rovner, Jonathan A. Choa, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Philippe Z. Selendy, David Elsberg, Sean P. Baldwin, Nicholas F. Joseph, Rollo C. Baker IV, QUINN EMANUEL URQUHART & SULLIVAN, LLP; New York, New York; *Attorneys for Defendants Vincent Vertin, Michael Sullivan, Patrick B. Gonzalez, Brandon Jundt, J. Eric Wagoner, Athilon Capital Corp., and Athilon Structured Investment Advisors LLC.*

Garrett B. Moritz, Eric D. Selden, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Philippe Z. Selendy, David Elsberg, Sean P. Baldwin, Nicholas F. Joseph, Rollo C. Baker IV, QUINN EMANUEL URQUHART & SULLIVAN, LLP; New York,

New York; *Attorneys for Defendants Merced Capital, L.P., Merced Partners Limited Partnership, Merced Partners II, L.P., Merced Partners III, L.P., and Harrington Partners, L.P.*

**LASTER, Vice Chancellor.**

Defendant Athilon Capital Corporation ("Athilon" or the "Company") became insolvent under the balance sheet test during the financial crisis of 2008. The Company remained insolvent for some time. At least by summer 2014, however, Athilon had returned to solvency.

During the intervening period of insolvency, defendant Merced Capital, L.P. and its affiliates (together, "Merced") acquired 100% of Athilon's equity. Merced is an investment manager that sponsors private equity funds. Through four of its funds, Merced acquired all of Athilon's equity.[1] Merced also purchased significant quantities of Athilon's publicly traded notes at deep discounts to their face value.

In a series of transactions that took place during 2011 and 2012, Athilon paid cash to purchase relatively illiquid securities from Merced. In January 2015, Athilon paid cash to purchase a sizeable block of notes from Merced. This post-trial decision addresses the challenges to those transactions.

---

[1] The four funds (collectively, the "Funds") were Merced Partners Limited Partnership ("Merced I"), Merced Partners II, L.P. ("Merced II"), Merced Partners III, L.P. ("Merced III"), and Harrington Partners, L.P. ("Harrington"). For purposes of the claims addressed in this action, the distinction between Merced and the Funds makes little difference. To simplify matters, this decision refers generally to Merced, unless clarity requires specifying the Funds or a particular Fund.

Merced formerly was known as EBF & Associates, L.P., and earlier decisions in this litigation refer to Merced by that name. *See, e.g.*, *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 106 A.3d 992 (Del. 2013); *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 115 A.3d 535 (Del. Ch. 2015); *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 2014 WL 5465535 (Del. Ch. Oct. 28, 2014); *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 102 A.3d 155 (Del. Ch. 2014); *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 2013 WL 3233130 (Del. Ch. June 20, 2013). Merced changed its name for business reasons unrelated to this litigation.

The party challenging the transactions is plaintiff Quadrant Structured Products Company, Ltd. ("Quadrant"), an entity in the same business as Athilon. Like Merced, Quadrant purchased Athilon's publicly traded notes at deep discounts. Quadrant invested in the notes believing that Merced would dissolve Athilon and liquidate its assets. Although in liquidation Athilon's assets might not be sufficient to satisfy all of its creditors, it could pay off the senior notes in full and provide a meaningful recovery on the more junior notes. Creditors like Merced and Quadrant who had purchased the notes at discounted prices would reap healthy returns.

But Merced had other plans for Athilon. Merced recognized that under the terms of the indentures that governed Athilon's notes, Athilon was not obligated to dissolve and liquidate. Merced planned to continue operating Athilon, return the Company to solvency, and then generate returns for itself over time in its capacity as the holder of 100% of Athilon's equity. Generating returns for equity holders is the opposite of a fiduciary wrong; it is the purpose of a for-profit entity. *See generally* Leo E. Strine, Jr., *The Dangers of Denial: The Need for a Clear-Eyed Understanding of the Power and Accountability Structure Established by the Delaware General Corporation Law*, Wake Forest L. Rev. (forthcoming 2015).

Through this litigation, Quadrant sought initially to force Athilon to liquidate. Quadrant originally contended that Athilon only could engage in the defunct business of writing uncollateralized credit default swaps. Because that business was no longer viable, Quadrant contended that Athilon had to sit on its cash until its last swap rolled off, at which point the Company would be required to liquidate. After that claim was dismissed,

Quadrant continued to press fraudulent transfer and breach of fiduciary duty claims challenging transactions between Athilon and Merced.[2] During the litigation, Quadrant learned about Athilon's purchases of securities and notes from Merced. In April 2015, Quadrant filed a second amended and supplemental complaint (the "Supplemental Complaint") challenging those transactions.

Quadrant contended at trial that the repurchase of Merced's notes breached express covenants in the indenture governing the notes and also violated the implied covenant of good faith and fair dealing. Quadrant also contended that the repurchases of the notes constituted a fraudulent transfer. Relying on its status as a creditor of an insolvent company, Quadrant claimed derivatively that the repurchases of the notes and the securities constituted breaches of fiduciary duty by Merced and the individual defendants, who comprised Athilon's board of directors (the "Board").

This post-trial decision rejects Quadrant's claims.

## I.    FACTUAL BACKGROUND

A five-day trial took place on June 22-25 and 30, 2015. The parties submitted over 900 exhibits, called six fact witnesses and five expert witnesses, and lodged twenty-three depositions. The following facts were proven by a preponderance of the evidence.

---

[2] Quadrant principally challenged Athilon's payments of allegedly excessive service and licensing fees to an affiliate of Merced, as well as Athilon's failure to defer the payment of interest on junior notes held by Merced. After trial, Merced mooted those claims. *See* Dkt. 395.

3

**A.     The Company**

Athilon was formed in 2004 by non-party Lightyear Capital LLC ("Lightyear"), a private equity firm. Athilon's executive team envisioned selling credit protection products in two markets: workers' compensation reinsurance and credit default swaps. The workers' compensation business never took off. The swap business did.

Through a wholly owned subsidiary, Athilon wrote uncollateralized credit default swaps on senior tranches of collateralized debt obligations. Athilon guaranteed the swaps that its subsidiary wrote. Athilon's original equity capital consisted of $100 million contributed by Lightyear. On the strength of its equity capital and business model, Athilon raised $600 million in long-term debt.

- In 2004, Athilon issued two series (A and B) of Subordinated Deferrable Interest Notes (the "Mezz Notes") in an aggregate principal amount of $150 million. The Mezz Notes will mature in 2045.

- In 2005, Athilon issued four series (A, B, C, and D) of Senior Subordinated Deferrable Interest Notes (the "Senior Notes") in an aggregate principal amount of $250 million. The Series A and B Senior Notes will mature in 2035 and the Series C and D Senior Notes will mature in 2045.

- In 2006, Athilon issued Junior Subordinated Deferrable Interest Notes (the "Junior Notes") in an aggregate principal amount of $50 million. They will mature in 2046.

- In 2007, Athilon issued a fifth series of Senior Notes (Series E) in an aggregate principal amount of $100 million, and a third series of Mezz Notes (Series C) with a face value of $50 million. They will mature in 2047.

In total, Athilon issued $350 million of Senior Notes, $200 million of Mezz Notes, and $50 million of Junior Notes (collectively, the "Notes"). All of the Notes were subordinate to Athilon's obligations on its swaps.

4

All of the Notes were issued pursuant to and are governed by indentures. The evidence at trial established that the indentures are borrower-friendly documents that contain relatively few covenants and other protective provisions. The pertinent indenture for the claims in this case is the one governing the Senior Notes (the "Senior Indenture").

The interest rates on the Senior Notes and the Mezz Notes were initially determined by auctions that occurred every twenty-eight days. The rates fluctuated slightly above LIBOR, much like commercial paper and other cash-like securities. In 2007, the auctions failed. Since then, the Senior Notes and the Mezz Notes have paid a contractually specified rate equal to one-month LIBOR plus 250 basis points (L+250). The Junior Notes initially paid interest at a fixed rate of 6.27% per annum. On November 15, 2013, the Junior Notes began paying three-month L+250. The evidence at trial established that these are low and borrower-friendly rates.

**B.    Athilon's Relationship With The Rating Agencies**

To write uncollateralized swaps, Athilon needed triple-A ratings from the two leading credit rating agencies, Moody's and Standard & Poor's ("S&P"). To obtain them, Athilon committed to conduct its business in accordance with operating guidelines approved by the agencies (the "Operating Guidelines"). Athilon's certificate of incorporation (the "Charter") mandated compliance with the Operating Guidelines.[3]

---

[3] A combination of mutually reinforcing and somewhat redundant provisions achieved this result. Article III of Athilon's Charter limited its business purpose to five categories of activities, each of which referenced the Operating Guidelines. JX 11.0001-.0002. More succinctly, Article VI of the Charter stated that "[t]he business of the Corporation shall be conducted in compliance with the Operating Guidelines, which may

5

The Operating Guidelines restricted Athilon's business to guaranteeing swaps written by a triple-A rated subsidiary. The Operating Guidelines devoted eight pages to defining the criteria for and terms of the swaps that Athilon's subsidiary could write. *See* JX 13.0008-.0020. The Operating Guidelines also constrained the type of investments that Athilon could make. Generally they were limited to dollar-denominated investments of the highest credit quality, such as Treasury securities, money market funds, short-term repurchase agreements on Treasury securities, and short-term commercial paper. *See* JX 13.0038.

The Operating Guidelines defined a series of items as "Suspension Events," including if the counterparty credit ratings of Athilon or its subsidiary were downgraded below triple-A status. JX 13.0021-.0022. Once a Suspension Event occurred, then Athilon no longer could write new swaps until the Suspension Event was cured. If the Suspension Event persisted more than six months, then the ban on writing new swaps became permanent, and the Operating Guidelines required Athilon to run-off its existing swaps as they matured.

At the pleading-stage, an earlier decision in this case credited for purposes of analyzing the defendants' motion to dismiss an allegation in Quadrant's complaint that "After the runoff process is complete, the Operating Guidelines obligate the Company to liquidate." *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 102 A.3d 155, 167 (Del. Ch.

not be amended or repealed except in accordance with Article XVI hereof." JX 11.0004. Article XVI locked in these restrictions by limiting Athilon's ability to modify them through charter amendments. *See* JX 11.0008-.0009.

6

2014). The trial record showed otherwise. The Operating Guidelines did not specify what would happen after Athilon ran off its existing book of swaps.

The Operating Guidelines required that Athilon obtain approval from the rating agencies, called Rating Agency Confirmation, before it could depart from the Operating Guidelines. The Rating Agencies only would provide Rating Agency Confirmation if they determined that a proposed change would not hurt Athilon's credit rating. This limitation only acted as a meaningful constraint while Athilon had a high credit rating.

Consistent with the tentative plans of Athilon management, the Operating Guidelines mentioned that Athilon might engage in other lines of business. Moody's noted that "[Athilon] is planning to form one or more subsidiaries . . . to engage in insurance, reinsurance or related business." JX 13.0005. Nevertheless, the Operating Guidelines required that Athilon obtain Rating Agency Confirmation before forming or capitalizing any new subsidiary.

The Operating Guidelines were written for the benefit of Athilon's swap counterparties, not the holders of its Notes. To that end, the Operating Guidelines gave the swap counterparties the right to enforce the Operating Guidelines as third party beneficiaries. They did not give similar enforcement rights to holders of the Notes. Other companies that wrote swaps gave their debtholders the right to enforce their operating guidelines by including provisions to that effect in the governing indentures. *See, e.g.,* JX 37.0019. Other companies that wrote credit default swaps also included provisions in their debt that required the companies to redeem their debt if they stopped writing credit

7

default swaps and had no more credit default swaps outstanding. *See*, *e.g.*, JX 37.0012. Athilon's indentures did not.

## C.      Athilon's Swap Book Deteriorates.

Before the financial crisis of 2008, Athilon's business model was viable. On the strength of $700 million in committed capital, Athilon wrote swaps with a notional value of $45 billion. The vast majority of Athilon's swaps referenced investment grade bonds, but two referenced pools of residential mortgage-backed securities (the "RMBS Swaps").

After the failure of Lehman Brothers, the market for uncollateralized swaps vanished. During the financial crisis, all of Athilon's swaps suffered mark-to-market losses. The losses on the RMBS Swaps were particularly severe.

In late 2008, Athilon commuted one of the RMBS Swaps for a payment of $48 million—approximately half of Athilon's equity capital. The loss on the second RMBS Swap loomed larger. In December 2008, Athilon lost its triple-A rating. On January 15, 2009, Moody's reported that several Suspension Events had occurred. On June 18, the cure period expired, and Athilon entered runoff. By the end of 2009, Athilon was insolvent and had no operating business.

## D.      Merced Enters The Scene.

In 2009, Merced began examining Athilon as an investment opportunity. Vincent Vertin, a partner at Merced, took the lead on analyzing Athilon. He concluded that Athilon's Notes looked attractive at the distressed prices prevailing in the market. In late 2009, Merced bought Senior and Mezz Notes with a par value of $200 million, paying 24% and 10% of par value, respectively.

Vertin also evaluated Athilon's equity. He recognized that unless the second RMBS Swap was successfully commuted, Athilon's equity was worth "[p]robably zero," JX 100.0002. But he thought that with a successful commutation, the equity could be worth around $60 million. On that point, Vertin correctly perceived that Athilon's Charter, the Operating Guidelines, and the indentures governing the Notes did not require Athilon to dissolve and liquidate after its swap book ran off. The Operating Guidelines only required that Athilon remain in runoff until the last swap expired. After that, the restrictions imposed during runoff would lift, and Vertin believed that Athilon would be able to reposition its portfolio from cash equivalents to higher yielding investments. At that point, because of the Notes' distant maturity dates, virtually non-existent covenants, and low coupon, Athilon could support the interest payments with significantly less than $600 million in capital. Using the excess capital, Merced could achieve a return on its investment by "equitizing" the Notes and paying a large dividend. JX 100.0003.

In early 2010, Merced successfully negotiated to buy all of Athilon's equity from Lightyear for $47.4 million. The transaction closed in August.

After the acquisition, Merced reconstituted the Board. The new members were Vertin, Michael Sullivan, J. Eric Wagoner, and Brandon Jundt. Sullivan was another partner in Merced. Wagoner and Jundt were unaffiliated outside directors. The only continuing director was Patrick B. Gonzalez, Athilon's CEO. Gonzalez shared Vertin's view about Athilon's potential value.

9

With Merced at the helm, Athilon reopened negotiations with the counterparty on the second RMBS Swap. Around October 2010, Athilon paid $325 million to commute it—over six times Athilon's remaining equity capital of approximately $52 million.

At year-end 2010, Athilon's GAAP balance sheet showed that the Company was deeply insolvent. Athilon held cash and securities worth $427 million against its outstanding obligations on the Notes of $600 million. In addition, Athilon reported mark-to-market losses on its swap book of $544 million. Athilon's balance sheet also listed a $96 million "non-current tax liability" and a $296 million deferred tax asset. The balance sheet reported shareholder equity of negative $513 million.

Vertin and Gonzalez did not believe that the GAAP balance sheet accurately reflected Athilon's solvency. Among other reasons, they believed that if Athilon held its remaining swap book to maturity, then Athilon would not suffer any additional loses and in fact would receive income in the form of swap premiums.

### E.    The XXX Securities

Consistent with Vertin and Gonzalez's thesis for generating value, Athilon began exploring moderately more risky assets that could generate potentially higher returns. Prompted by Merced, Athilon focused on XXX securities. Despite their name, there is nothing prurient about them. The securities began appearing in 2001 after the National Association of Insurance Commissioners promulgated a model regulation known formally as Model Regulation #830 on the Valuation of Life Insurance Policies. Informally, because of its Roman numeral designation, it is known as "Regulation XXX."

Regulation XXX required insurance companies to hold levels of capital reserves for term life insurance policies that were up to eight times higher than the previous regime. Many industry participants believed that the additional reserve requirements were excessive. To meet them, financial advisors helped insurance companies raise additional capital by securitizing claims to excess reserves.

The basic structure works as follows: An insurer creates and capitalizes a wholly owned, special purpose vehicle ("SPV") to act as a reinsurer for a specified group of term life insurance policies. The insurance company and the SPV enter into a reinsurance agreement pursuant to which the insurance company cedes the premiums on the underlying policies in return for the SPV agreeing to pay the death benefits when they come due. The SPV then issues debt in the market, which it uses to purchase high-quality assets. The debtholders' claim on the SPV's assets is junior to the death benefit obligations, but senior to the equity claim of the insurance company. The debt issued by the SPV is called a XXX security.

Examples of SPVs that issued XXX securities include Ballantyne, River Lake I, River Lake II, River Lake III, River Lake IV, LIICA, Double Oak, and Rivermont. In a typical securitization, the SPV would be capitalized with $200 million in equity from the insurance company, raise another $1 billion by issuing XXX securities, and use the proceeds to purchase $1.2 billion in assets.

Before the financial crisis, XXX securities were viewed as safe, low risk investments that generated higher returns than cash. When the financial crisis hit, XXX securities began trading at deep discounts. In part this was due to their complex structure.

It also reflected a mismatch between the attributes of the securities and their owners. For example, many investors bought XXX securities as higher-yielding cash equivalents, expecting to be able to exit every twenty-eight days through the auction rate feature. Once the auctions failed, they instead found themselves holding opaque, illiquid assets.

At Merced, Vertin studied XXX securities. After Vertin and his team concluded that XXX securities were significantly undervalued, Merced began buying them avidly. By the end of 2009, Merced had paid $400 million to acquire XXX securities with a par value of approximately $1 billion.

Merced believed that XXX securities would be a good investment for Athilon. XXX securities have long maturities, matching the long-term obligations represented by Athilon's debt. Gonzalez was familiar with XXX securities because Athilon already owned XXX securities with a par value of approximately $65 million. Ironically, Athilon had not known it was buying the securities. Lehman Brothers, which had managed Athilon's cash and cash equivalents, purchased them on Athilon's behalf. When the financial crisis hit and the value of XXX securities plummeted, Athilon sued Lehman alleging that Lehman did not have authority to buy the XXX securities. The case settled.

At the end of 2010, Gonzalez came to agree with Vertin that XXX securities represented an attractive investment at then-prevailing market prices. On December 17, 2010, Athilon purchased XXX securities issued by LIICA with a face value of $25 million at 70.20% of par. In January 2011, Athilon purchased $43.5 million face value of Ballantyne at a blended price of 30% of par value.

To make sizable investments in XXX securities, Athilon needed to amend the Operating Guidelines. To amend the Operating Guidelines, Athilon needed Rating Agency Confirmation. At the time, Athilon's credit ratings remained bathic, so investing in securities with a higher risk/return profile was unlikely to lower its sub-investment grade credit ratings any further.

On May 2011, the Rating Agencies signed off on Athilon's proposed changes, and Athilon amended the Operating Guidelines. The amendments expanded Athilon's "Eligible Investments" to include "Other Permitted Investments," which included XXX securities. JX 197.

In June 2011, after receiving Rating Agency Confirmation, Athilon purchased XXX securities from third parties. The following table shows the dates and amounts.

| Date | Issuer | Face Amount | % Par Paid |
|---|---|---|---|
| June 6, 2011 | Ballantyne A2A | $30 million | 49.19% |
| June 6, 2011 | LIICA | $50 million | 79.37% |
| June 6, 2011 | River Lake IV | $25 million | 76.97% |
| June 21, 2011 | Ballantyne A2A | $75 million | 43.47% |

## F.    Quadrant Purchases Notes.

Also in early 2011, Quadrant began purchasing Senior Notes and Mezz Notes. Quadrant's investment thesis, like Merced's, was that the Notes were undervalued. Quadrant believed that Merced would generate a return for its investors by liquidating Athilon after the swap portfolio ran off. Quadrant knew its strategy was risky. Quadrant recognized that the Notes did not contain an express covenant requiring that Athilon redeem its Notes after the last swap matured. Quadrant also spoke to Vertin, who told Quadrant that Merced might repurpose Athilon's business. But Quadrant did not think

13

Merced would be able to extract a return from Athilon without dissolving the Company, and Quadrant believed it had a reasonable legal argument that Athilon was required to liquidate. Quadrant decided to take the risk and invest in the Notes.

Quadrant also tried to nudge Merced towards dissolving Athilon. On July 8, 2011, Quadrant contacted Athilon and Merced to object to how they were managing Athilon. First, Quadrant complained that Athilon was continuing to pay interest on the Junior Notes, all of which were owned by Merced. Athilon had the ability to defer interest payments on the Junior Notes for up to five years. During that period, interest would be "paid in kind" and added to principal at a higher penalty rate. Quadrant argued that the Junior Notes would receive nothing in a near-term liquidation, so Athilon's decision not to defer interest transferred value from the owners of the more senior tranches of Notes to Merced.

Second, Quadrant objected that Athilon was paying excessive fees to an affiliate of Merced, including approximately $23 million in management fees in 2010. Quadrant claimed that Athilon was overpaying by $17 million per year and offered to provide a portion of the services at a lower rate. Part of Quadrant's business model at the time was to approach other credit default companies and offer to provide management services at a lower cost. Quadrant quickly discovered that it was being naïve. All of the credit default companies were sponsored by their parent companies and had entered into service agreements with affiliates of their parent companies. The amounts being paid were not negotiated at arms' length and did not reflect a market rate. They effectively provided a way for the parent company to obtain a return on its investment. The credit default

14

companies had no more interest in or ability to hire a cheaper third party provider than the investment funds sponsored by a particular asset management firm would have in hiring a different asset manager.

Third, Quadrant argued that the Board was breaching its fiduciary duties by investing in the XXX securities. Quadrant contended that the swap business was no longer viable and that Athilon was insolvent. Quadrant asserted that consequently, after the swap portfolio ran off, the Board should liquidate Athilon and distribute the proceeds according to the priority of claims in its capital structure. Quadrant contended that by causing Athilon to invest in the XXX securities, Merced was engaging in a "heads-I-win, tails-you-lose" investment strategy. If the riskier strategy paid off, the equity and Junior Notes would benefit. If it failed, the more senior tranches of Notes would bear the loss.

The Board and Merced were not convinced by Quadrant's arguments. They did not accede to its demands or alter Athilon's business strategy.

## G. This Litigation

Quadrant filed suit in this court on October 28, 2011. The complaint re-framed the objections Quadrant had made to Athilon as claims for breach of fiduciary duty, which Quadrant contended it had standing to bring derivatively because of Athilon's insolvency. The complaint also asserted direct claims alleging that the payments to Merced affiliates constituted fraudulent transfers and that Athilon had breached the implied covenant of good faith and fair dealing that inheres in the Senior Indenture.

The case did not advance beyond the pleading stage for some time. Readers interested in its complex procedural history can consult the opinion denying the

15

defendants' motions for summary judgment. *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 115 A.3d 535, 541-43 (Del. Ch. 2015).

**H.    The XXX Securities**

Later in the summer of 2011, Merced decided it wanted to sell some of its XXX securities. Merced had two primary reasons for exiting its positions. The main reason was taking profits. The prices of the XXX securities had risen significantly. Although Merced thought the pricing still had room to run, Merced believed it could maximize the Funds' internal rate of return by selling, thereby shortening the time period for the return calculations.

A secondary reason was timing. At least one of the Funds—Merced II—was nearing the end of its lifecycle. Merced structured its funds with an investment period of two to five years followed by a harvest period of three years. During the investment period, as its name implies, Merced would identify potential investments and deploy the fund's capital. During the harvest period, likewise as its name implies, Merced would look to sell investments, generate profits, and distribute cash to the fund's investors. Merced II's harvest period was scheduled to end in early 2012.

Although the incentives created by a harvest period can have significant effects on fund manager behavior, it was at most a secondary consideration in this case. Merced had flexibility to extend Merced II's harvest period as long as Merced could convince the investors in Merced II that the extension was warranted, and the other Funds were not in a similar position. Harrington was just starting its harvest period, which would run through June 2015. Merced III's harvest period would not begin until 2014 and would

16

run until 2017. Merced I was an evergreen fund and its indefinite duration meant it did not have a harvest period.

To begin liquidating its position in the XXX securities, Merced engaged Barclays to sell securities with a par value of $244.6 million through a Bid-Wanted-In-Competition ("BWIC"). Under this process, Barclays publicized the fact that one of its clients planned to sell particular securities to the highest bidder, then entertained incoming bids from potential purchasers. When it became clear that the BWIC was generating lower prices than Merced expected, Vertin advocated against selling. The Merced management team disagreed and decided that the Funds should sell.

Vertin then suggested that Merced could achieve its goal of generating cash for the Funds while still preserving some of the remaining upside on the XXX securities if Merced sold part of its position to Athilon rather than to a third party. Athilon only had the capacity to purchase $100 million of par value of the XXX securities at the time, so Merced sold $144.6 million of the original $244.6 million block to third parties at 60% of par. On October 13, 2011, Merced sold the remaining $100 million to Athilon at the same price.

Over the next year and half, Merced sold an additional $194.55 million in par value of XXX securities to Athilon. Each time, Athilon and Merced set the price Athilon paid by seeking an indication of the prices that third parties were paying in the market. They either executed a spot purchase of the same security from a third party or obtained bids for the security from third parties. In each case, Athilon paid the price available in the market or a lower price.

At trial, the defendants introduced statutory filings made by insurance companies which identified the prices at which those companies engaged in third-party transactions involving the XXX securities during the same period. In all but two transactions, Athilon paid the same price or a lower price than what the insurance companies paid during the same period in arms' length transactions. For the two exceptions, Athilon paid only slightly more. In one purchase of XXX securities with a par value of $2.5 million, Athilon paid 0.1% more than the contemporaneous price in a third party transaction. In another purchase of XXX securities with a par value of $18.9 million, Athilon paid 1.75% more.

## I.       Athilon Achieves Solvency.

By December 2013, Athilon's financial condition had improved substantially. The decision to hold Athilon's swap portfolio to maturity had been a good bet, and the large mark-to-market loss had turned into a small mark-to-market gain.

To further improve Athilon's balance sheet, Merced tendered all the Junior Notes to Athilon for cancellation in December 2013 (the "December 2013 Contribution"). Merced held the Junior Notes through the Funds, but the Funds did not tender the Notes directly to Athilon. Instead, the Funds surrendered the Junior Notes to Athilon Group Holdings Acquisition Partners, LLC ("AcquistionCo"), the acquisition vehicle through which Merced had acquired Athilon. Merced's predecessor, Lightyear Capital, owned Athilon through Athilon Group Holdings Corp. ("HoldCo"), which owned 100% of Athilon's equity. When Merced acquired Athilon, AcquistionCo acquired 100% of the stock of HoldCo, which continued to own 100% of Athilon's equity.

After receiving the Notes from the Funds, AcquisitionCo exchanged them with HoldCo, receiving preferred stock from HoldCo in return with a face value of $16.4 million. HoldCo then tendered the Notes to Athilon for cancellation. Athilon did not provide any consideration for the Notes.

Merced took back preferred stock from HoldCo only because it enabled Athilon to avoid negative tax consequences. The preferred in HoldCo stock had no claim on Athilon's assets, and it was structurally subordinated to the holders of the Notes and anyone else with a claim against Athilon.

By virtue of the December 2013 Contribution and the turnaround in Athilon's swap book, the Company's GAAP financials improved markedly. Athilon's GAAP balance sheet reported negative equity of $105 million at year-end 2013, which was substantially better than the negative equity of $513 million that Athilon reported at year-end 2010. Athilon's assets consisted of $553 million of cash and securities, a $50 million deferred tax asset, and $17 million in other assets. Athilon's liabilities consisted of the remaining $550 million in Notes, a non-current tax liability of $170 million, and $4 million in other liabilities. The $553 million in cash and securities slightly exceeded the $550 million in outstanding Notes, so it was the other assets and liabilities that produced Athilon's continuing GAAP insolvency.

The biggest contributor to Athilon's GAAP insolvency was the non-current tax liability of $170 million. Merced and Athilon believed that Athilon would never be required to pay it, but Athilon's auditors resisted removing the item from Athilon's balance sheet. In July 2014, the IRS sent Athilon a "no-change letter" which indicated

that Athilon would not have to amend its 2011 tax return or pay additional amounts for the tax liability related to that year. Although the letter technically did not relate to other tax years, Athilon, Merced, and their advisors regarded the letter as a strong indication that Athilon did not face any liability in other years. Based on the no-change letter, Athilon removed the non-current tax liability from its financial statements. Making that adjustment retrospectively to Athilon's December 31, 2013, balance sheet results in Athilon having $65 million of positive stockholder equity as of that date.

## J.      Merced Offers To Sell Athilon Its Notes.

After receiving the no-change letter from the IRS, Merced believed Athilon was balance-sheet solvent. Vertin decided that Athilon therefore could repurchase a portion of Merced's Notes without a meaningful risk of liability. On July 10, he proposed that Athilon pay $313.5 million to repurchase Notes held by Merced with a par value of $352 million. The proposal contemplated having Athilon pay 92% of par for the Senior Notes and 83% of par for the Mezz Notes.

The Board rejected Vertin's proposal. Jundt, one of the independent directors, believed the legal risk was too high. He testified that he believed the transaction made economic sense because (i) Athilon would realize a gain by repurchasing its debt below par, and (ii) Athilon would achieve certain tax benefits from repurchasing debt from an affiliated party. He testified that he also believed that Athilon was solvent. He nevertheless was concerned that Athilon did not yet have audited GAAP financials showing solvency, and he knew that Quadrant was likely to challenge any repurchase of Notes from Merced.

20

In an attempt to assuage Jundt's concerns, Merced obtained a solvency opinion from FTI Consulting, Inc. In October 2014, Merced submitted a proposal for a smaller repurchase in which Athilon would pay $276.5 million for Notes held by Merced with a par value of $312 million.

Jundt told the other Board members that the solvency opinion was not enough to address his concerns. The Board did not accept Merced's smaller proposal either.

## K. The January 2015 Repurchase

After the Board rejected the smaller proposal, Merced realized that it could create additional stockholders' equity at Athilon by tendering additional Notes, just as it had tendered the Junior Notes in December 2013. In December 2014, Merced contributed a combination of Senior and Mezz Notes with a par value of $117.5 million to Athilon (the "December 2014 Contribution"). In exchange, Merced received preferred stock in HoldCo. From Athilon's perspective, as in the December 2013 Contribution, the Notes were tendered for no consideration. As before, the preferred stock issued by HoldCo was structurally subordinated to any claims on the Athilon capital structure. Merced caused HoldCo to issue the preferred stock solely to minimize the tax consequences to Athilon.

The December 2014 Contribution eliminated liabilities of $117.5 million from Athilon's balance sheet. The reversal of the non-current tax liability had eliminated a contingent liability of $170 million. Athilon's year-end 2014 GAAP balance sheet showed that the company was solvent, with positive equity of $173 million.

With audited financial statements showing GAAP solvency in hand, Jundt and the other directors approved a repurchase of Merced's remaining Notes. On January 14,

21

2015, Athilon paid $179 million to purchase Senior Notes with a par value of $194.6 million, paying 92% of par (the "January 2015 Repurchase").

Primarily as a result of these transactions, Athilon's unaudited financials as of March 31, 2015, showed that stockholders' equity had increased to $178 million. Athilon had assets of $376 million in cash and securities, plus $41 million in other assets, for total assets of $417 million. Athilon's liabilities consisted of $238 million in outstanding Notes plus $1 million in other liabilities.

## L.    The Supplemental Complaint

Around the beginning of March, Quadrant learned about Athilon's purchases of the XXX securities and the January 2015 Repurchase. Quadrant promptly filed the Supplemental Complaint, which challenged those transactions.

## II.    LEGAL ANALYSIS

Quadrant is a creditor of Athilon. In this lawsuit, Quadrant sued derivatively for breach of fiduciary duty and contended that the defendants had made fraudulent transfers. Almost as an afterthought, Quadrant brought direct claims premised on an alleged violation of the Senior Indenture. When devoting resources to the litigation, the parties prioritized the claims in this order.

This decision addresses the claims in the opposite order. As Chief Justice Strine explained while serving as a Vice Chancellor, deploying fiduciary duties to protect creditors should be a final resort, not a first response.

> Creditors are often protected by strong covenants, liens on assets, and other negotiated contractual protections. The implied covenant of good faith and fair dealing also protects creditors. So does the law of fraudulent

22

conveyance. With these protections, when creditors are unable to prove that a corporation or its directors breached any of the specific legal duties owed to them, one would think that the conceptual room for concluding that the creditors were somehow, nevertheless, injured by inequitable conduct would be extremely small, if extant.

*Prod. Res. Gp., L.L.C. v. NCT Gp., Inc.*, 863 A.2d 772, 790 (Del. Ch. 2004). In a later decision, also written while a Vice Chancellor, the Chief Justice revisited these themes:

Both state law and federal law provide a panoply of remedies in order to protect creditors injured by a wrongful conveyance, including avoidance, attachment, injunctions, appointment of a receiver, and virtually any other relief the circumstances may require. . . . [Further,] financial creditors . . . know how to craft contractual protections that restrict their debtors' use of assets. In a situation when creditors cannot state a claim that such contractual protections have been breached and cannot prove a fraudulent conveyance claim, the creditors' frustration does not mean that there is a gap in the remedial fabric of the business law that equity should fill. Rather, it means that we remain a society that recognizes that reward and risk go together, and that there will be situations when business failure results in both equity and debt-holders losing some money.

*Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 199 (Del. Ch. 2006) (footnote omitted), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007).

A creditor's principal source of protection is its agreement with its debtor, so this decision starts with the claims premised on the Senior Indenture. A creditor should look next to statutory remedies designed for the benefit of creditors, such as Delaware's Uniform Fraudulent Transfer Act ("DUFTA"), so this decision next deals with those claims. Last, this decision addresses the derivative claims for breach of fiduciary duty.

In each phase, this decision only addresses Quadrant's theories of primary liability. None support relief. Quadrant also has advanced theories of secondary liability

23

(tortious interference with contract, aiding and abetting, and conspiracy), but because the primary theories fail, the secondary theories fall short as well.

## A.   The Challenge To The January 2015 Repurchase Under The Senior Indenture

In Count VII of the Supplemental Complaint, Quadrant contended that by engaging in the January 2015 Repurchase, Athilon violated the express terms of Article IV of the Senior Indenture. In Count VIII of the Supplemental Complaint, Quadrant contended that the January 2015 Repurchase violated the implied covenant of good faith and fair dealing inherent in the Senior Indenture.

The Senior Indenture is governed by New York law, so New York law governs Counts VII and VIII. *See Bank of N.Y. Mellon v. Realogy Corp.*, 979 A.2d 1113, 1120 (Del. Ch. 2008). Under New York law, words of a contract are enforced in accordance with their plain meaning. *Sutton v. E. River Sav. Bank,* 435 N.E.2d 1075, 1078 (N.Y. 1982). Individual words and provisions should not be read in isolation, but rather in light of the "plain purpose and object" of the agreement. *Kass v. Kass*, 696 N.E.2d 174, 181 (N.Y. 1998). A contract should be read as a whole. *Niagara Frontier Transp. Auth. v. Euro-United Corp.*, 757 N.Y.S.2d 174, 176 (N.Y. App. Div. 2003).

Courts strive to give indenture provisions a consistent and uniform meaning because "[u]niformity in interpretation is important to the efficiency of capital markets." *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982) (Winter, J.). "Whereas participants in the capital market[s] can adjust their affairs according to a uniform interpretation, . . . the creation of enduring uncertainties as to the

24

meaning of boilerplate provisions would decrease the value of all debenture issues and greatly impair the efficient working of capital markets." *Id.*; *accord Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 398-99 (Del. 1996) (discussing importance of certainty in interpretation of standard provisions used in capital market transactions).

"Courts enhance stability and uniformity of interpretation by looking to the multi-decade efforts of leading practitioners to develop model indenture provisions." *Concord Real Estate CDO 2006-1, Ltd. v. Bank of Am. N.A.*, 996 A.2d 324, 331 (Del. Ch. 2010) *aff'd*, 15 A.3d 216 (Del. 2011) (TABLE). Those efforts began in 1960 with the Corporate Indenture Project, an initiative of the Committee on Developments in Business Financing of the American Bar Association's Section on Business Law. *See* Churchill Rodgers, *The Corporate Trust Indenture Project*, 20 Bus. Law 551 (1965). The Model Debenture Indenture Provisions were completed in 1965, followed by the Model Debenture Indenture Provisions—All Registered Issue in 1967. In 1971, the American Bar Foundation published a volume entitled *Commentaries on Indentures* [hereinafter, the "*Commentaries*"]. The *Commentaries* contain sets of model provisions and offer section-by-section analysis. In 1983, a working group of the Committee on Developments in Business Finance published the *Model Simplified Indenture*, 38 Bus. Law. 741 (1983). In 2000, the Committee on Developments in Business Financing of the American Bar Association's Section of Business Law collaborated with the Committee on Trust Indentures and Indenture Trustees and the Business Bankruptcy Committee's Subcommittee on Trust Indentures (formed in the mid-1990s) to publish the *Revised Model Simplified Indenture*, 55 Bus. Law. 1115 (2000). The latter two models were

25

"simplified" in that they focused on the structural and boilerplate sections that typically are not negotiated, while omitting the financial covenants and similar provisions that are heavily negotiated and tailored to a specific issuer and transaction. The Committee on Trust Indentures and Indenture Trustees has since published the *Model Negotiated Covenants and Related Definitions*, 61 Bus. Law. 1439 (2006), which provides model provisions for non-boilerplate, negotiated sections. "While these materials obviously are no substitute for construing the agreement, they provide powerful evidence of the established commercial expectations of practitioners and market participants." *Concord Real Estate*, 996 A.2d at 331.

### 1. Breach Of Article IV Of The Senior Indenture

Quadrant claims that the January 2015 Repurchase breached Article IV of the Senior Indenture, entitled "Redemption of Securities." As Quadrant reads it, Article IV prohibits selective repurchases that benefit insiders. As I read it, Article IV authorizes one type of mandatory redemptions and excludes treasury securities from the universe of Notes available for mandatory redemption. It does not create broader protections for holders of Senior Notes.

The principal section in Article IV is Section 4.01, which grants Athilon the right to redeem Notes on particular terms. It states:

> *Right of Optional Redemption; Prices.* The Issuer at its option may, on any Auction Date during any Subsequent Rate Period and on any date designated by the Issuer during any Deferral Period, redeem all or any part of any series of the Securities, subject to Article 5 hereof, at a redemption price equal to 100% of the principal amount of the Securities to be redeemed, plus any accrued and unpaid interest thereon to the Redemption Date (the "Redemption Price"); *provided* that the Issuer may not redeem all

26

or any part of the Securities if after giving effect to such redemption, the Issuer's then-current counterparty credit ratings by the Rating Agencies would be downgraded. Notwithstanding the preceding sentence, the Issuer shall not redeem in part any series of the Securities if such partial redemption would cause the aggregate principal amount Outstanding of any series of the Securities to be less than $20,000,000 on the applicable Redemption Date, unless such series of the Securities is redeemed in whole on such Redemption Date.

JX 16.0043 (the "Redemption Right") (bold text for defined terms omitted).

Subsequent sections in Article IV establish procedures and parameters for the Redemption Right, including (i) requirements for prior notice (§ 4.02), (ii) procedures for payment (§ 4.03), and (iii) the exclusion of securities identified by the Issuer as being owned by the Issuer and its Affiliates (§ 4.04). Quadrant relies principally on Section 4.04, which states in full:

> *Exclusion of Certain Securities from Eligibility for Selection for Redemption*. Securities shall be excluded from eligibility for selection for redemption if they are identified by registration and certificate number in a written statement signed by an Officer of the Issuer and delivered to the Trustee at least 20 days prior to the Redemption Date, as being owned of record and beneficially by, and not pledged or hypothecated by, either (a) the Issuer or (b) an Affiliate of the Issuer.

JX 16.0045. The Senior Indenture defines "Affiliate" to mean "any Person controlling, controlled by or under common control with such Person." JX 16.007. Under this definition, Merced was an "Affiliate" of the Issuer.

The plain language of these provisions grants Athilon the Redemption Right. Without these provisions, Athilon would not have had the ability to redeem Notes unilaterally: "In the absence of special provisions in a debenture issue, a debentureholer cannot be compelled to accept payment of his debenture prior to its stated maturity date.

27

If the Company desires to have the privilege to pay the debt before maturity, then this privilege must be one of the subjects of negotiation." *Commentaries*, *supra*, at 475 (footnote omitted). The Redemption Right thus gave Athilon a right it could exercise. It did not impose on Athilon an obligation not to purchase Notes except under Article IV, nor did it establish protections from holders of Senior Notes that would enable them to prevent Athilon from engaging in other types of transactions.

Section 4.04 does not change the nature of the Redemption Right. One of the questions that drafters of an indenture must address when creating a redemption right is how to handle treasury securities held by the issuer. Under the model provision suggested by the *Commentaries*,

> [t]he selection of debentures to be redeemed . . . is made from the "Outstanding Debentures," . . . and in accordance with customary practice, includes treasury debentures. If, as is sometimes provided, treasury debentures . . . are not intended to participate in the redemption, then [the provision] should also require the Company to notify the Trustee of the number of debentures held in its treasury so that these will be excluded from the selection. In those situations where treasury debentures are not eligible for redemption, they may nevertheless be discharged by delivery to the Trustee with a request for cancellation . . . .

*Id.* at 494. The last sentence of this paragraph, which refers to an issuer delivering treasury securities for cancellation, recognizes the continuing vitality of the delivery rule under New York law, pursuant to which "the delivery of a promissory note to the obligor with the intent to cancel the note discharges the obligation and cancels the debt." *Concord Real Estate*, 996 A.2d at 332 (collecting cases). Merced utilized the delivery rule for the December 2013 Contribution and the December 2014 Contribution.

Section 4.04 departs from the usual rule identified in the *Commentaries*. Section 4.04 states that Notes held in Athilon's treasury or by its affiliates are not available for redemption. Section 4.04 does not restrict Athilon from acquiring Notes in other ways, nor does it grant any additional protections to holders of Senior Notes.

Article IV and the January 2015 Repurchase did not have anything to do with each other. The January 2015 Repurchase was not a redemption governed by Article IV. Nor did Article IV limit Athilon's ability to engage in the January 2015 Repurchase. The latter was a voluntary transaction, not a mandatory redemption.

This analysis of Article IV comports with the conclusions reached by the Senior Indenture Trustee. On February 11, 2015, Quadrant's counsel contacted the Senior Indenture Trustee, claiming that the January 2015 Repurchase constituted a default under Sections 4.02(e) and 4.04 of the Senior Indenture. The Trustee replied: "Our preliminary look . . . shows that there have not been any actual redemptions on this issue." JX 620.0001. On March 24, 2015, Quadrant and other noteholders asked the Trustee to pursue remedies for breach of the Senior Indenture. The Trustee declined.

Against this reasoning, Quadrant makes one textual argument. Because the Notes that Athilon repurchased were delivered to the Trustee for cancellation, Quadrant says they necessarily were redeemed under Section 2.09 of the Senior Indenture. That section provides that "[i]f [Athilon] shall acquire any of the Securities, such acquisition shall not operate as a redemption or satisfaction of the indebtedness represented by such Securities unless and until the same are delivered to the [Indenture] Trustee for cancellation." JX 16.0027. According to Quadrant, once the Notes were delivered for cancellation, the

29

repurchase became a redemption, and if the redemption was not conducted in accordance with Article IV, the Senior Indenture was breached.

Section 2.09 is an administrative provision that addresses the point at which treasury securities are cancelled. Its language speaks broadly to any means by which Athilon acquires Notes and makes clear that Notes are not automatically cancelled simply because Athilon acquires them. Section 2.09 extends the time during which the Notes are deemed issued and outstanding by providing that Athilon's acquisition of the Notes, standing alone, does not "operate as a redemption or satisfaction of the indebtedness." Athilon must take the additional step of cancelling the Notes.

Under Section 2.09, if Athilon exercises the Redemption Right, then the redemption is not complete until the Notes are cancelled. If Athilon acquires Notes by other means, then the Notes are not satisfied until they are cancelled. Section 2.09 does not convert other types of acquisitions into redemptions.

Quadrant failed to prove any entitlement to relief under what should be its primary source of protection: the express terms of the Senior Indenture. Quadrant's other claims are appropriately evaluated against that backdrop, because through its other claims, Quadrant is seeking to obtain a right that it did not bargain for explicitly. That does not mean that Quadrant's other claims should be rejected, only that they should be taken with an extra grain of salt.

### 2. Breach of the Implied Covenant of Good Faith and Fair Dealing

Having failed to identify an express provision of the Senior Indenture that was breached, Quadrant contends that the January 2015 Repurchase violated an implicit term

30

that can be read into the Senior Indenture using the implied covenant of good faith and fair dealing. Quadrant's proposed term is that "with no business left to pursue, [Athilon] will return capital to its stakeholders, and will *not* return capital only to its insiders." Pl.'s Post-Trial Br. 32.

Every New York contract contains an implied covenant that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton v. Educ. Testing Serv*., 87 N.Y.2d 384, 389 (N.Y. 1995) (quoting *Kirke La Shelle Co. v. Armstrong Co.*, 263 N.Y. 79, 87 (N.Y. 1933)). A covenant is fairly implied in a written agreement when a reasonable person, reviewing those terms, would understand the term to be necessary to the enjoyment by each party of its rights under the express terms. *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (N.Y. 2002). Nevertheless, "a court cannot imply a covenant inconsistent with terms expressly set forth in the contract." *Hartford Fire Ins. Co. v. Federated Dept. Stores, Inc.*, 723 F. Supp. 976, 991 (S.D.N.Y. 1989) (applying New York law). "The implied covenant in a bond indenture is not a license for judges to invent market terms that should act as a default rule simply because plaintiffs or the judge think they would be a good thing. Bond indentures are carefully negotiated instruments filled with many restrictions." *In re Loral Space & Commc'ns, Inc.*, 2008 WL 4293781, at *3 (Del. Ch. Sept. 19, 2008) (Strine, V.C.) (applying New York law).

The Senior Indenture contains detailed provisions governing the repayment of principal. It is undisputed that the Senior Notes do not come due for more than twenty years. Under the Senior Indenture, there is no provision for the distribution of proceeds as

31

principal until the Notes have become due and payable. Redemption prior to the maturity date can be demanded only upon an Event of Default, and then only when all "Senior Indebtedness" has been satisfied.[4] Early redemption is otherwise "at [the] option" of the Issuer; it is not mandatory. JX 17 at § 4.01. None of these provisions restrict Athilon's use of debt capital in the manner proffered by Quadrant. The implied term that Quadrant has proposed is inconsistent with these explicit terms and therefore cannot be implied into the Senior Indenture.

The term that Quadrant proposes to include in the Senior Indenture also conflicts with the parties' understandings while in the original bargaining position. Quadrant's term triggers dissolution when Quadrant has "no business left to pursue," a concept which assumes that Athilon was limited to the credit default swap business. But Athilon was not limited to that business. The Private Placement Memorandum recognized that although Athilon could not "establish any new subsidiaries unless the Rating Agencies confirm that [Athilon's] then-applicable counterparty ratings will not be lowered or withdrawn . . . as a result of such establishment," Athilon could amend the Operating Guidelines "without the approval of the holders of the Notes, to permit activities not

---

[4] JX 17 at § 7.02(f) (if there has been an Event of Default, "either the Trustee or the holders of not less than 50% of the aggregate principal amount of the relevant series of Securities at the time Outstanding hereunder, by notice in writing to the Issuer . . . may declare the entire principal of all the relevant series of Securities and the interest accrued thereon, to be due and payable immediately . . . . Notwithstanding anything to the contrary in this Article 7, neither the Trustee nor the Securityholders may accelerate the maturity of any series of Securities, if an Event of Default shall have occurred and be continuing, unless no Senior Indebtedness is outstanding at the time of such acceleration.").

currently contemplated by the Operating Guidelines." JX 14.0007. In other words, as long as Athilon obtained Rating Agency Confirmation, it could expand its business and continue operating after winding down its swap book.

Although the language of the Senior Indenture itself disposes of the implied covenant claim, evidence from indentures issued by peer companies demonstrates that when parties intended to create mandatory redemption requirements or limitations on the business to be conducted by the issuer, they included the provisions expressly.

- Quadrant's wholly owned subsidiary, Cournot, is a credit default products company like Athilon. Unlike the Senior Indenture, the indenture governing Cournot's debt required Cournot to redeem its notes once all of its credit default swaps expired and limited Cournot to the credit default products business. *See* JX 37 at §§ 2.4, 3.6.

- Quadrant purchased notes issued by Primus, another credit default products company. The indenture governing Primus' debt required redemption of its notes once the credit default swap book matured and limited Primus to the credit default products business. *See* JX 217.0207-.0304 at § 4.06, 6.08.

Similar language does not appear in the Senior Indenture. Before buying Athilon's notes, Quadrant recognized that there was "no mandatory call" for the Athilon notes when "the swaps rolled off." Tr. 978 (Nance). As Quadrant's CEO and 30(b)(6) witness admitted, "Quadrant's belief was that the Athilon indentures did not require redemption of the notes after the last swap expired, whereas the Primus indenture did." Nance Dep. 625-26.

The implied covenant of good faith and fair dealing does not provide a basis for adding Quadrant's new term to the Senior Indenture. Because Quadrant failed to prove a violation of either the explicit or implicit terms of the Senior Indenture, judgment is entered in favor of Athilon on Counts VII and VIII of the Complaint.

33

**B.    The Challenges To The January 2015 Repurchase As A Fraudulent Transfer**

In Count VI, Quadrant asserted that the January 2015 Repurchase was a fraudulent transfer. Delaware's version of the Uniform Fraudulent Transfer Act ("DUFTA") recognizes two types of fraudulent transfers: (i) intentionally fraudulent transfers made with an actual intent to defraud creditors and (ii) constructively fraudulent transfers.

**1.    Athilon's Solvency**

Whether Athilon was solvent at the time of the challenged transfers plays a major role in the fraudulent transfer analysis. Insolvency is a factor to be considered when determining whether a fraudulent transfer was intentional, and it is a prerequisite for establishing a constructive fraudulent transfer. This decision finds that Athilon had returned to solvency by July 2014.[5]

**a.    The DUFTA Solvency Analysis**

Under DUFTA, "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation." 6 *Del. C.* § 1302(a). "A debtor who is generally not paying debts as they become due is presumed to be insolvent." *Id.* at § 1302(b). A company's GAAP financial statements are not automatically dispositive. *See, e.g.*, *In re Lids Corp.*, 281 B.R. 535, 540 (Bankr. D. Del. 2002). They do, however,

---

[5] This opinion's determination of solvency should not be seen for more than what it is: a judicial finding on a contested fact for purposes of litigation. "[W]hether the corporation is solvent or insolvent is not a bright-line inquiry and often is determined definitively only after the fact, in litigation, with the benefit of hindsight." *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 115 A.3d 535, 552 (Del. Ch. 2015). Although the line is often fuzzy and dim, legal rules turn on the question of solvency, so this decision must address it.

provide a starting point, which is why they were sufficient to (i) support an inference of insolvency for purposes of the motion to dismiss, *see Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 177 (Del. Ch. 2014), and (ii) provide evidence of insolvency for purposes of the motion for summary judgment, *see Quadrant Structured Prods. Co., Ltd. v. Vertin*, 115 A.3d 535, 556-57 (Del. Ch. 2015). The ultimate question of solvency, however, turns on whether the sum of the debtor's debts is greater than all of the debtor's assets, with both sides of the balance sheet given a fair valuation. *See* Unif. Fraudulent Transfer Act § 2 cmt. 1 (Unif. Law Comm'n 1984) (explaining that UFTA "contemplate[s] a fair valuation of the debts as well as the assets of the debtor"). Put another way: "To decide whether a firm is insolvent . . . , a court should ask: What would a buyer be willing to pay for the debtor's entire package of assets and liabilities? If the price is positive, the firm is solvent; if negative, insolvent." *Covey v. Commercial Nat'l Bank of Peoria*, 960 F.2d 657, 660 (7th Cir. 1992) (Easterbrook, J.). During trial, the parties presented extensive evidence on the issue of solvency as well as expert opinions relating to that question. As the party seeking to prove the validity of a related-party transfer, Athilon had the burden of proving solvency. *Tri-State Vehicle Leasing, Inc. v. Dutton*, 461 A.2d 1007, 1008 (Del. 1983).

There are some indications that Athilon was solvent by late 2009, when Merced negotiated to buy all of Athilon's equity from Lightyear for $47.4 million. The fact that Merced paid money for Athilon's equity in a market transaction is powerful evidence that the equity actually had value. Other sophisticated acquirers were also willing to pay for

Athilon's equity.[6] The principal value of the equity at the time flowed from the future value that Athilon might generate if it could commute its last RMBS Swap. At that point, Athilon could generate returns using the capital provided by the long-dated, low-coupon, covenant-light debt. The cash that Athilon might generate by investing that cheap and locked-in capital in higher yielding investments was contingent, and its realization turned in particular on a major variable (the last RMBS Swap). But the risk-adjusted present value of the future cash flow could be calculated, just like the cash flow that an operating business might generate and which a court might value for purposes of an appraisal. Despite these market indications that Athilon's equity had value, this decision assumes that Athilon remained insolvent for legal purposes.

Athilon took another step towards solvency in October 2010, when Athilon paid $325 million to commute its last RMBS Swap. With the benefit of hindsight, a strong argument can be made that once that swap came of the books, Athilon was solvent. Nevertheless, on a balance sheet basis, the cost of commuting the swap was over six times Athilon's remaining equity capital of approximately $52 million, and Athilon's balance sheet remained in the red. Once again, this decision assumes that Athilon remained insolvent for legal purposes.

After addressing the last RMBS Swap, Athilon began investing in XXX securities. Those investments performed well. Meanwhile, as Athilon's swap book matured, the

---

[6] *See* Tr. 1060:8-18, 1063:2-1064:11 (Vertin); Tr. 164:16-167:1, 168:4-169:4 (Gonzalez); JX 54; JX 63; JX 808.

book value of its largest liability decreased. By December 2013, the previously large mark-to-market loss on the swap book had become a small mark-to-market gain. That same month, Merced tendered all of its Junior Notes to Athilon, which removed a $50 million liability from Athilon's books.

Based on the evidence presented at trial, this decision could hold that as of December 31, 2013, Athilon was solvent. Even on a GAAP balance sheet basis, the question was close. Athilon's GAAP balance sheet still reported negative equity of $105 million, but one of Athilon's liabilities was a contingent tax liability of $170 million. That liability related to the possible disallowance of Athilon's election to treat its credit default swaps as options for tax purposes. Most credit default product companies, including Quadrant's Cournot, treat credit default swaps as options for tax purposes. No one at trial thought that Athilon faced any meaningful exposure for that tax liability. Without that liability, Athilon would have been solvent under GAAP.

To show otherwise, Quadrant argued at trial that Athilon's GAAP financials overvalued the XXX securities portfolio by $24 million. The evidence at trial demonstrated that Athilon's GAAP financials *undervalued* the XXX securities portfolio.

Quadrant also argued at trial that Athilon's GAAP financials should have accounted for an unrecorded tax liability of $53 million for the 2012 tax year. During that year, Merced acquired all of Athilon's equity, resulting in a change in control over Athilon. Section 382 of the Internal Revenue Code limits a taxpayer's right to use losses from before a change of control to reduce its tax liability after the change in control. *See* I.R.C. § 382 (2014). Under Section 382(h), the taxpayer subtracts the fair market value of

the corporation's assets from the adjusted basis of the assets. If the result is positive, then the corporation has a net unrealized built-in gain ("NUBIG"). If the result is negative, then the corporation has a net unrealized built-in loss ("NUBIL"). *See id*. at § 382(h). The larger the NUBIL, the stricter the limitations are on the taxpayer.

When Athilon calculated the size of its NUBIG or NUBIL, it added to the fair value of its assets $230 million of "accelerated income" that consisted of swap income that it had received, but not recognized, because it had treated the swaps as options for tax purposes. Athilon thus calculated that it had a NUBIG of $146 million. Quadrant contends that including the $230 million of "accelerated income" double-counted $230 million of assets on Athilon's balance sheet. Excluding the $230 million of "accelerated income," Athilon would have had a NUBIL of $84 million.

Athilon paid less in taxes in 2011 and 2012 based on its calculation that it had a NUBIG. The IRS audited Athilon's 2011 taxes. As part of the audit, the IRS asked for and received Athilon's calculations showing that it had a NUBIG. The IRS accepted Athilon's calculation that it had a NUBIG and issued a no-change letter for Athilon's 2011 taxes. That meant that the IRS would not require Athilon to make any adjustments to its 2011 taxes absent fraud or falsification. Quadrant concedes that Athilon did not need to report a 2011 tax liability associated with the alleged miscalculation at that point. However, Athilon has not yet received a similar no-change letter for the Company's 2012 taxes.

Quadrant's expert opined that a tax liability existed under the statute for the 2012 tax year, but he did not take into account Athilon's correspondence with the IRS or the

likelihood that the liability would be realized. Quadrant's evidence was not sufficient to warrant departing from Athilon's audited GAAP financials on the issue.

Based on the foregoing analysis, Athilon had returned to solvency by July 2014, when the IRS issued the no-change letter. Athilon likely was solvent before this, but to be conservative, this decision uses July 2014.

### b. Quadrant's Other Arguments

At trial, Quadrant presented an analysis designed to show that even if Athilon became solvent under a balance sheet test, the Company remained insolvent under the cash flow test because Athilon would not be able to pay its debts when they came due. That analysis assumed that Athilon only would invest in low-yield, liquid securities and pay unsustainably large dividends to Merced. Neither assumption is valid. First, the evidence at trial showed that Athilon intended to make longer-term, higher-yielding investments. Second, Athilon cannot make future dividend payments at the level that the analysis assumed because they would violate statutory restrictions imposed by the Delaware General Corporation Law. *See* 8 *Del. C.* § 170.

Perhaps more importantly, Quadrant's insolvency theories cannot be reconciled with its approach—outside of litigation—to its own credit default products company, Cournot. As Quadrant's witnesses admitted, if Cournot were analyzed using the same standards that Quadrant sought to apply to Athilon, then Cournot would have been insolvent for two years during which Quadrant treated Cournot as solvent. During that period of time, Quadrant paid $243 million to purchase Cournot's equity and caused

Cournot to pay a $40 million dividend to Quadrant. Quadrant never believed Cournot was insolvent.

## 2. The January 2015 Repurchase Under DUFTA

Quadrant has challenged the January 2015 Repurchase as both an intentionally fraudulent transfer and a constructively fraudulent transfer. A transaction only can be constructively fraudulent if the debtor was insolvent at the time or became insolvent as a result of the transaction. 6 *Del. C.* § 1305(a)-(b). This decision has determined that Athilon returned to solvency by July 2014. The January 2015 Repurchase did not render Athilon insolvent; it strengthened Athilon's balance sheet. Given these facts, the January 2015 Repurchase could not have been a constructively fraudulent transfer. Nor was it an intentionally fraudulent transfer.

Section 1304 provides that a transfer is fraudulent under DUFTA as to both present and future creditors if made "[w]ith actual intent to hinder, delay or defraud any creditor of the debtor." *Id.* at § 1304(a)(1). "[I]f one acts with knowledge that creditors will be hindered or delayed by a transfer but then intentionally enters the transaction in disregard of this fact, he acts with actual intent to hinder and delay them." *ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 387 (S.D. Tex. 2008) (applying Delaware law). Intent means "that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." Restatement (Second) of Torts § 8A (1965); *ASARCO*, 396 B.R. at 387.

Intent is a question of fact. 37 C.J.S. *Fraudulent Conveyances* § 76. Section 1304(b) of DUFTA identifies a non-exclusive list of factors for a court to consider when evaluating "actual intent." They include whether:

(1)     The transfer or obligation was to an insider;

(2)     The debtor retained possession or control of the property transferred after the transfer;

(3)     The transfer or obligation was disclosed or concealed;

(4)     Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5)     The transfer was of substantially all the debtor's assets;

(6)     The debtor absconded;

(7)     The debtor removed or concealed assets;

(8)     The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9)     The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10)    The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11)    The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

6 *Del. C.* § 1304(b). "The confluence of several of these factors, without the presence of all of them, is generally sufficient to support a conclusion that one acted with the actual intent to defraud." *Kilber v. Wooters*, 2007 WL 1756595, at *4 (Del. Ch. June 6, 2007). When a transfer takes place between persons with a "confidential relationship," Delaware law shifts the burden of proof to the insiders to overcome a presumption of fraud. *See*

41

*Wilm. Sav. Fund Soc'y v. Kaczmarczyk*, 2007 WL 704937, at *7 (Del. Ch. Mar. 1, 2007) ("Defendants have [not] met their burden of rebutting the presumption of fraud that arises from transfers between insiders in similar circumstances . . . .").

This decision holds that the January 2015 Repurchase was not a fraudulent transfer under the "actual intent" standard. Having heard the witnesses testify and considered the evidence, I find that Athilon did not act with the "actual intent to hinder, delay or defraud any creditor of the debtor" required for a fraudulent transfer claim under 6 *Del. C.* § 1304(a)(1). After the January 2015 Repurchase, Athilon planned to continue operating as a solvent "blank check company" or "hedge fund" type entity to take advantage of its long-term, covenant-light debt. Athilon expected that it would be able to generate returns from its capital basis sufficient to make interest payments on the Notes over time and pay off the Notes when they came due, decades in the future. Athilon intended to comply with its obligations to its creditors, which were minimal.

The evidence at trial established that only two of the factors identified in Section 1304(a) were present in this case. The transfer was to an insider (factor 1), and this litigation was pending at the time of the transfer (factor 4). The defendants could perhaps be faulted under the third factor as well: they were neither open nor forthright about their preparations for the January 2015 Repurchase, and they resisted providing information about the transaction once Quadrant learned of it. But that course of conduct seems driven more by the defense lawyers' instinctive resistance to discovery than by any underlying business rationale, and the defendants suffered adverse rulings during discovery because of their attorneys' overly aggressive positions.

It is true that Athilon and Merced intended through the January 2015 Repurchase to reduce the amount of cash that Athilon held, and it is arguably true that this step increased the risk of default faced by Athilon's remaining creditors. All else equal, creditors would like more security and a bigger cash cushion because it makes it more likely that the entity will pay its debts. The fact that a business decision runs contrary to a creditor's generic preference for greater security does not mean that the decision was made with an actual intent to hinder, delay, or defraud any creditor. Virtually every business decision has some affect on a company's financial health, its credit profile, and hence the likelihood that its creditors will be repaid. When the decision involves cash leaving the firm, the effect on creditors may be plainer, but the basic legal principles do not change. Unless a creditor bargains for an applicable contract right, the creditor does not have the ability to interfere with the operations of a solvent firm.

Quadrant and the other holders of Notes purchased debt that had minimal contract rights. Their protections largely amounted to the expectation that Athilon would seek to preserve its triple-A credit rating and avoid measures that would jeopardize that rating. Unfortunately for Athilon's creditors, once Athilon lost its triple-A rating, the consequence was gone, and the check on Athilon's behavior lost its power. At present, Athilon and its management plan to manage the Company's business to maximize the value of the equity and take full advantage of the lenient terms provided by Athilon's creditors. Nothing about that plan involves an intent to defraud creditors.

C.     **The Challenges To The January 2015 Repurchase And The Purchases Of The XXX Securities As Breaches Of Fiduciary Duty**

Quadrant lastly sought to challenge the January 2015 Repurchase and the purchases of XXX securities as breaches of fiduciary duty, suing derivatively on behalf of Athilon. "To maintain a derivative claim, the creditor-plaintiff must plead and later prove that the corporation was insolvent at the time suit was filed." *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 115 A.3d 535, 556 (Del. Ch. 2015). Quadrant did not raise specific breach of fiduciary duty challenges to the January 2015 Repurchase or the purchases of XXX securities until April 14, 2015, when Quadrant filed the Supplemental Complaint. At that point, Athilon was solvent. Because of this fact, Quadrant lacked standing to assert its breach of fiduciary duty claims.

Quadrant has argued that the Supplemental Complaint should relate back to its original complaint, which was filed on January 6, 2012, at a time when Athilon was insolvent. Under Court of Chancery Rule 15(c), "[a]n amendment of a pleading relates back to the date of the original pleading when . . . the claim or defense asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading." Ch. Ct. R. 15(c). "[I]f a plaintiff attempts to allege an entirely different transaction by amendment, Rule 15(c) will not authorize relation back." *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 2012 WL 3201139, at \*17 (Del. Ch. Aug. 7, 2012) (Strine, C.) (quoting 6A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure: Civil* § 1497 (3d ed. updated 2012)). "The determinative factor for a Delaware court applying Rule 15(c) is whether a defendant should have had notice from the original pleadings that the plaintiff's new

44

claim might be asserted against him." *Id.* (internal quotation marks omitted) (citing *Atlantis Plastics Corp. v. Sammons*, 558 A.2d 1062, 1065 (Del. Ch. 1989)).

The original complaint did not put the defendants on notice about Quadrant's challenges to the purchases of the XXX securities or the January 2015 Repurchase. The original complaint did not mention those transactions, precisely because they had not occurred yet. The purchases of the XXX securities and the January 2015 Repurchase took place *after* the original complaint was filed. *See Atlantis Plastics*, 558 A.2d at 1065 (holding that amended complaint did not relate back when "[t]he original complaint fails to mention [the plaintiff] or in any other way indicate her involvement in" the action and "[t]he original complaint merely alleged breaches by the Individual Defendants of their fiduciary duty to [the corporation] at a time when [the plaintiff] was not even a shareholder").

Quadrant correctly points out that the Supplemental Complaint stressed the same themes as the original complaint. From the outset, Quadrant has opposed as a matter of principle any transactions that would enable Merced to extract value from Athilon without other holders of Notes receiving their *pro rata* share. But a general principle is not the same as a legal claim. Quadrant's original complaint challenged servicing fees paid to a Merced affiliate and interest payments that Merced received on its Junior Notes, both of which were mooted. The challenges to the purchases of XXX securities and the January 2015 Repurchase involved different facts and different wrongs. *See Cent. Mortg. Co.*, 2012 WL 3201139, at *18 (holding that Rule 15(c) did not apply because "breaches . . . in the Amended Complaint [were] entirely separate instances of breach than those

45

alleged in the Original Complaint, because they [were] based on different loans and distinct instances of misrepresentation"). "[A] separate independent violation of the same contract provision does not arise out of the same conduct, transaction or occurrence as did the first, unrelated violation." *Id.*

Quadrant's derivative claims challenging the January 2015 Repurchase and the purchases of XXX securities did not arise out of the same conduct, transaction, or occurrence as the claims that Quadrant originally asserted. Quadrant therefore had to plead and later prove that Athilon was insolvent at the time Quadrant asserted its new derivative claims. Because Athilon was solvent when Quadrant introduced those claims, Quadrant lacked standing to sue.

## III. CONCLUSION

Athilon did not violate the terms of the Senior Indenture, the defendants did not engage in fraudulent transfers, and Quadrant cannot pursue its remaining claims for breach of fiduciary duty. Quadrant may seek an award of attorneys' fees and expenses for the mooted claims. Otherwise each side shall bear its own costs.